**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **KIMBERLI LYNN SNODGRASS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:11-CV-219-P(BH)** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to *Special Order No. 3-251,* this case was automatically referred for determination of non-dispositive motions and issuance of findings, conclusions, and recommendations on dispositive motions. Before the Court are *Plaintiff's Brief* ("Pl. Br."), filed May 19, 2011 (doc. 9), and *Defendant's Motion for Summary Judgment*, filed June 20, 2011 (doc. 11). Based on the relevant filings, evidence, and applicable law, Plaintiff's motion should be **DENIED,** Defendant's motion should be **GRANTED**, and the final decision of the Commissioner should be **AFFIRMED**.

## I.  BACKGROUND[1]

### A.  Procedural History

Kimberli Snodgrass ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claims for disability benefits under Title II of the Social Security Act and for supplemental security income payments under Title XVI. (R. at 10.) Plaintiff applied for supplemental security income and disability insurance benefits on August 26, 2008, alleging disability beginning April 1, 2008, due to bipolar disorder and depression.

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

(R. at 121-127, 162.)  Her claims were denied initially and upon reconsideration.  (R. at 10.)  On

May 27, 2009, Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"),

and personally appeared and testified at a hearing held on March 10, 2010.  (R. at 10, 29-53.)  On

April 28, 2010, the ALJ issued a decision finding Plaintiff not disabled.  (R. at 10-24.)  Plaintiff

appealed, and the Appeals Council denied her request for review, making the ALJ's decision the

final decision of the Commissioner.  (R. at 1-3.)  Plaintiff timely appealed the Commissioner's

decision to the United States District Court pursuant to 42 U.S.C. § 405(g). (*See* doc. 1.)

**B.  Factual History**

**1.  Age, Education, and Work Experience**

Plaintiff was born in 1959.  (R. at 33.)  She has two years of college education and medical

assistance training, and has past relevant work experience as a caregiver and cook.  (R. at 35-36, 46.)

**2.  Medical Evidence**

***a. Evidence Before the ALJ***

The Medical evidence shows that Plaintiff has bipolar disorder, personality disorder, panic

disorder, polysubstance abuse, and hyperthyrodism.  (R. at 256-57, 327, 329, 366, 396, 493.)

On May 23, 2008, after being pulled over for weaving on the road, Plaintiff was taken by the

police to Wise Regional Hospital for a blood draw.  (R. at 294.)  At the hospital, she reported that

she took Methadone on a daily basis and that her last dose had been earlier that day.  (R. at 298.)

Around the same time frame, she was involved in a car accident and served six days in jail.  (R. at

212.)  On July 17, 2008, Plaintiff's daughter died from an apparent drug overdose.  (R. at 35, 262.)

Plaintiff was found eligible to receive mental health treatment services at Helen Farabee

Regional MHMR ("MHMR") on August 5, 2008.  (R. at 418.)  She visited the MHMR on August

2

7, 2008, and reported poor sleep since the death of her daughter. (R. at 212.) She reported staying in her apartment and watching television all day and night. (*Id*.) She also reported symptoms of depression and anxiety, including thoughts of death, but denied any suicide attempt. (R. at 213.) She denied taking medication for one and a half years but stated that Xanax had helped her in the past. (R. at 213.) She reported that she had spent some time in prison in her twenties on charges related to marijuana, Valium, and Methadone, but she denied any illegal drug use in the past three years. (R. at 214.) She admitted drinking and stated that she had consumed two beers per day for three days along with two Valium pills during the previous week. (*Id*.) Her urine drug screen was positive for benzodiazepines, and she admitted that she had been taking Valium. (R. at 220.)

Plaintiff's mental status examination revealed that she was alert and had poor eye contact, manipulative attitude, fidgety and agitated motor activity, frustrated mood, labile and irritable affect, logical thought process, average range of intellectual functioning, and limited insight and judgment. (R. at 216.) Plaintiff had a global assessment of functioning ("GAF") score of 30. (R. at 215.) She was diagnosed with bipolar I disorder, polysubstance abuse, and borderline personality disorder. (*Id*.) She was prescribed Remeron for anxiety and insomnia. (*Id*.) She became very angry and agitated because she was not given the "Xanax bar" she had requested. (*Id*.)

On August 11, 2008, clinicians noted "moderate co-occurring" substance abuse while evaluating her condition. (R. at 414.) The same day, Plaintiff attended group therapy. (R. at 316.) She was distracting during the therapy and was resistant to staff suggestions on how to cope with self-esteem issues and their comments on her positive character traits and abilities. (*Id*.) On August 13, 2008, Plaintiff told her caseworker that she was going to intentionally overdose on black tar heroin upon returning home. (R. at 321.) The therapist believed that she was being manipulative

3

to avoid her August 14, 2008 discharge and referred her to a substance abuse center.  (*Id*.)  On August 21, 2008, following discharge from group therapy, Plaintiff reported that she had "much antidepressant benefit" from Prozac.  (R. at 219.)  When Dr. Smith adjusted her medication in order to obtain mood stabilization, she "began demanding Klonopin".  (R. at 220.)  Dr. Smith explained that he would not prescribe addictive medication due to her substance abuse, and that her anxiety would "greatly diminish" with mood stabilization.  (R. at 220.)

On August 21, 2008, Art Smith, M.D., saw Plaintiff for a psychiatric follow up.  (R. at 219-220.)  She complained of mania, depression, irritability, mood lability, insomnia, and anxiety.  (R. at 219.)  She reported some benefit with Prozac, a partial reduction in racing thoughts, a varying energy level, and sleep ranging three to four hours per night.  (*Id*.)  She stated that she had been off Methadone for six months and denied any recent substance abuse.  (*Id*.)

Dr. Smith noted that she had previously been treated for bipolar I disorder and had a history of polysubstance abuse dependence.  (R. at 220.)  Her urine screen was positive for benzodiazepines and she admitted having taken Valium prior to her admission.  (*Id*.)  Dr. Smith observed that Plaintiff was mildly to moderately tense; her affect was "quite intense" with some overt irritability; and her speech was rapid, pressured, and circumstantial.  (*Id*.)  Dr. Smith increased her dose of Seroquel and continued Prozac, but Plaintiff demanded Klonopin.  (*Id*.)  Dr. Smith declined to prescribe Klonopin and explained the need to avoid that type of addictive medication because of her substance abuse history.  (*Id*.)  On August 22, 2008, Dr. Smith opined that Plaintiff was permanently disabled due to bipolar I disorder, depressed, severe without psychosis.  (R. at 221.)

On December 15, 2008, Plaintiff was treated in the emergency room for anxiety and panic attacks.  (R. at 308-10.)  Drug screening performed at the time was negative and she was prescribed

Klonopin at discharge.  (R. at 308-09.)  On December 18, 2008, Plaintiff underwent an evaluation for suspected hyperthyroidism by Greg Garret, M.D.  (R. at 262.)  Dr. Garret noted that Plaintiff had visited her family physician, Gary Swain, the previous day in a state of heightened nervousness and anxiety with tachycardia and a noticeable tremor in her hands.  (*Id*.)  He noted that she had a "very strong history of prior intravenous drug use" in her earlier years.  (*Id*.)  She appeared to be shaken by the death of her daughter, whom she reported had died at the age of twenty-seven after choking on her own vomit while undergoing Xanax withdrawal.  (*Id*.)  Plaintiff reported being a recovering alcoholic with a history of abusing vodka for about ten years, but she claimed that she had stopped drinking and was attending Alcoholics Anonymous meetings on a regular basis.  (*Id*.)  Dr. Garrett noted that Plaintiff had asked Dr. Swain to prescribe a large amount of Xanax, which she had abused in the past.  (*Id*.)

On January 15, 2009, Plaintiff returned to MHMR after being in jail for three months for unpaid tickets.  (R. at 396.)  Plaintiff reported decreased sleep, fear of driving, fluctuating energy, increased anxiety, and a history of depression, irritability, and impulsive behavior.  (R. at 396.)  She also reported that she had abused heroin, cocaine, marijuana, speed, acid, benzodiazepines, and alcohol and had "last used"drugs in July 2008.  (*Id*.)  Her GAF score was 60.  (*Id.*)

On March 11, 2009, Kelly R. Goodness, Ph.D., saw Plaintiff for a psychological consultative evaluation.  (R. at 325.)  Plaintiff arrived for her appointment alone, reporting that she had driven herself and had traveled approximately forty-five miles.  (*Id*.)  She reported having been diagnosed with bipolar disorder, PTSD, and schizophrenia.  (*Id*.)  She had attempted suicide in the past and complained of depressive and manic symptoms.  (*Id*.)  She had gone several days without sleep; her manic symptoms lasted for one to two days; and she had auditory hallucinations and panic attacks

a few times a week.  (R. at 326.)  She had been hospitalized four or five times for thirty days during

each admission for mental health issues.  (R. at 327.)  She had been arrested twice since July 2008

for driving under the influence and that she spent three months in jail for each charge.  (*Id.*)  She also

reported a history of using marijuana, methamphetamine, sedatives, and heroin.  (*Id.*)  She stated that

she last used the illegal substances approximately one year earlier.  (*Id.*)  She had participated in five

substance abuse programs lasting thirty days each, but she had not participated in such a program

since the 1980s.  (*Id.*)  She participated in a methadone treatment program for six years and denied

the current use of alcohol.  (*Id.*)

During the evaluation, Plaintiff made appropriate eye contact, was cooperative, did not

exhibit any unusual behaviors, and had normal speech, appropriate responses, logical, relevant, and

goal directed thought processes with focused thought content and no evidence of a thought disorder.

(R. at 325-27.)  While she reported limited daily activities, Dr. Goodness noted no evidence that

she would have any problems getting along with supervisors or any likelihood that she would exhibit

poor social judgment.  (R. at 326.)  Plaintiff reported she had frequent interaction with individuals

other than her family.  (*Id.*)

Dr. Goodness noted that Plaintiff did not appear to maintain a level of concentration

necessary to complete tasks. (R. at 326.)  She noted that Plaintiff's attention and concentration were

only moderately impaired, her immediate memory was satisfactory, her remote memory appeared

intact, and her delayed memory was only mildly impaired.  (R. at 327-28.)  She diagnosed Plaintiff

with "Bipolar II Disorder, Depressed, Severe with psychotic features" and "Panic Disorder Without

Agrophobia".  (R. at 329.)  Her GAF score was 45.  (*Id.*)  She opined that Plaintiff's prognosis was

"poor due to the chronic nature of her symptoms" and that Plaintiff's problems were unlikely to be

corrected without continued intervention.  (*Id.*)

On March 12, 2009, MHMR diagnosis of Plaintiff was bipolar I, single episode, manic, in partial remission.  (R. at 389.)  She was assessed a GAF score of 60.  (R. at 389.)  In May 2009, Plaintiff was noted to have psychotic symptoms and was assigned a GAF score of 38.  (R. at 385.) Her GAF score on July 21, 2009 was 38.  (R. at 382.)

On September 15, 2009, Shirley Jordan, Ph.D., completed a psychiatric/psychological impairment questionnaire for Plaintiff, and she noted that she first began treating Plaintiff in 1989 on a weekly basis.  (R. at 366.)  She listed her diagnosis as bipolar I disorder, mixed episode, severe with psychotic features, and unspecified personality disorder.  (R. at 366.)  She noted Plaintiff's primary symptoms as depression, racing thoughts, insomnia, poor concentration, panic, anxiety attacks, fatigue on some days, agitation, restlessness, mood swings, poor judgment, social withdrawal, diminished ability to think, and indecisiveness.  (R. at 368.)  She assigned Plaintiff a poor prognosis and a GAF score of 30.  (*Id.*)

Dr. Jordan stated that Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerance, sustain an ordinary routine without supervision, work in coordination with or proximity to others without being distracted by them, complete a normal work week without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  (R. at 369-370.)  She also found Plaintiff markedly limited in her ability to interact appropriately with the general public, respond appropriately to changes in the work setting, travel to unfamiliar places or use public transportation, and set realistic goals or make plans

independently.  (R. at 370-371.)

Dr. Jordan noted that Plaintiff experienced episodes of deterioration or decompensation in work or work like settings that caused her to withdraw from that situation and/or experience exacerbation of signs and symptoms with anxiety that reached "panic states" in work situations.  (R. at 371.)  She opined that Plaintiff had problems with even basic functioning on a daily basis, and was not capable of even low stress work.  (R. at 372.)  She estimated that Plaintiff would miss work more than three times a month if she attempted to work.  (R. at 373.)  She found Plaintiff totally disabled without consideration of any past or present drug and/or alcohol use.  (R. at 365.)  She concluded that drug and/or alcohol use were not  material causes of Plaintiff's disability.  (*Id.*)

On December 21, 2009, Plaintiff was evaluated by George Mount, Ph.D.  (R. at 420.)  She complained of fluctuating energy levels, feelings of guilt and worthlessness, weight gain, and suicidal thoughts.  (*Id.*)  She reported being able to care for her own personal hygiene, make herself something to eat, attend to household chores, and shop for groceries.  (*Id.*)  She did not like to be around other people, but she could ride a bus and attend church.  (*Id.*)  She remembered to take her medication and could manage her own funds.  (*Id.*)  Dr. Mount diagnosed her with schizoaffective disorder, PTSD, and personality disorder with a GAF score of 40 to 43.  (R. at 433.)  He concluded that she experienced episodes of decompensation or deterioration in work or work-like settings that caused her to withdraw from the situation and/or experience an exacerbation in her signs and symptoms.  (R. at 438.)  He opined that Plaintiff was incapable of even low stress work and estimated that she would miss work more than three times a month due to her impairments or treatment.  (R. at 439- 440.)

On February 26, 2010, Plaintiff was admitted to the Trinity Springs Pavilion after attempting

8

suicide.  (R. at 450, 464.)  Her mental status examination revealed an unkempt appearance, fair eye contact, impulsive behavior, fair articulation, dysphoric mood, poor abstraction, tangential thoughts, illogical thinking, and poor insight and judgment.  (R. at 454.)  She was diagnosed with psychosis with a GAF score of 40.  (R. at 455.)

On February 28, 2010, Dr. Jordan completed a narrative report in which she noted that she had initially seen Plaintiff on August 2009.  (R. at 442-443.)  She noted that testing under the MMPI-2 indicated that Plaintiff experienced significant psychological problems, including withdrawal, difficulty coordinating, loss of control over impulses, decreased concentration, suicidal thoughts, and difficulty with relationships.  (R. at 443.)  Plaintiff was only comfortable with her family and had no friends.  (*Id*.)  She also had a high level of anger and did not trust others.  (*Id*.)  Dr. Jordan also noted that Plaintiff had little insight into her condition and only dealt with it when her depression and anxiety became overwhelming.  (*Id*.)  Plaintiff did not have any hallucinations, but her thinking was schizoid.  (*Id*.)  Dr. Jordan diagnosed Plaintiff with bipolar I disorder, most recent episode depressed, severe without psychotic features, schizoid personality disorder, and hypothyroidism.  (*Id*.)  Her GAF score was 40.  (*Id*.)  Dr. Jordan noted that Plaintiff was taking medication prescribed by her psychiatrist to stabilize her mood and treat her anxiety and depression. (*Id*.)

On March 1, 2010, Plaintiff was "calm and peaceful" with well-organized thought processes, good concentration, intact memory, normal speech, and appropriate affect.  (R. at 462.)  During a consultation on March 2, 2010, Plaintiff stated that she cut her legs to get her mother's attention. (R. at  464).  By March 5, 2010, Plaintiff reported she was "feeling surprisingly good," slept better than usual, felt relieved, and demonstrated normal mental findings.  (R. at 471.)  She was discharged

from the hospital the same day with a GAF score of 50. (R. at 472.) Her final diagnoses were psychosis and hypothyroidism. (R. at 447.)

### b. Additional Evidence Before the Appeals Council

On March 31, 2009, Dr. Smith reported that Plaintiff had an extensive prior psychiatric history when he first evaluated her in October 2005, and he continued treating her at MHMR. (R. at 493.) Plaintiff's symptoms included severe depression with suicidal thoughts, lack of energy and motivation, severe irritable mood swings with potential for violence to others, racing thoughts with inability to concentrate, severe paranoia and auditory hallucinations, profound anxiety, and general emotional lability. (*Id.*) He diagnosed her with bipolar I disorder, mixed, severe with psychosis, anxiety disorder, polysubstance dependence history, and borderline personality disorder. (*Id.*) He opined that Plaintiff was unable to meet the demands of or cope with workplace stress. (*Id.*)

### 3. Hearing Testimony

On March 10, 2010, Plaintiff and a vocational expert ("VE") testified at a hearing before the ALJ. (R. at 31-53.) Plaintiff was represented by her attorney. (R. at 31.)

### a. Plaintiff's Testimony

Plaintiff testified that she was fifty years old, had a high school degree, had attended two years of community college, had attended medical assistant school, was divorced, and lived alone. (R. at 35-36.) She lived in a government subsidized apartment and last worked in March 2008 in home health care. (R. at 36.) Her home health care position required her to give her clients their medicine, clean the house, do their groceries, and help them take baths. (*Id.*) She testified that prior to quitting that job, she started getting "panicky" that she would give the wrong medicine to her clients, was overly scared about giving the wrong medicine, and began panicking over little things.

(*Id.*)  She quit that employment after  "freaking" out when she got lost for more than two hours on her way to a home health care assignment; she decided she did not want to go back anymore.  (R. at 37.)

She testified that she had not been employed since April 2008, and that she was unable to "get back up again" and find employment after her daughter died on July 17, 2008.  She could not work because she had too much stress and too many panic attacks.  (*Id.*)  She could barely go into Wal-Mart, unless it was early in the morning and relatively empty, because her  "head start[ed] spinning and everything turn[ed] white and [she] just [had] to run out of the store".  (*Id.*)  Plaintiff testified that her mother worried about her all the time.  (R. at 38.)  About twice a week, her mother picked her up at her apartment, took her home, and assigned her a "job" such as sweeping and mopping.  (*Id.*)  They then spent the rest of the day visiting.  (*Id.*)  When not at her mother's house, Plaintiff spent her time at home.  (R. at  43.)  Plaintiff did not clean her house or cook very much. (*Id.*)  She usually just made herself a sandwich or a pop tart to eat.  (R. at 38.)  She did her laundry at her mother's house.  (*Id.*)  She watched some television but not continuously, because her concentration was not very good.  (R. at 38-39.)  She did not own a computer, read books or magazines, or have a bank account.  (R. at 39.)  She did not normally have any difficulty sitting, standing, or walking, but she recently began having a hard time walking because of injuries she inflicted on her legs.  (*Id.*)

Plaintiff also testified that she smoked eleven or twelve cigarettes a day, did not drink alcohol, and had stopped using street drugs when her daughter died, but she had been using methadone.  (R. at 39.)  She took Seroquel, Trilafon, Prozac, and Trazodone.  (R. at 40.)  In February 2010, she was hospitalized for an attempted suicide that she believed was the result of a

panic attack.  (*Id.*)  She had not driven in about three years.  (*Id.*)  She had last been incarcerated in December 2009 for three months for a DWI, and she had not had any alcohol since then.  (*Id.*)

Plaintiff further testified that she, her daughter, and her mother were all paranoid schizophrenics.  (R. at 42.)  She had stopped working because she could not drive and could not go into stores, and because she only felt safe with her mother.  (*Id.*)  She sometimes experienced "high" days where she was really excited or happy, but those were not as frequent as her " low" days that could occur for two months at a time.  (*Id.*)  When experiencing a low, she could barely get out of bed, felt terrible, and cried.  (*Id.*)

In 2009, she had attempted suicide on three occasions.  (R. at 44.)  She had trouble sleeping and only slept about two hours a day.  (R. at 45.)  She had been seeing Dr. Jordan since she was about twenty years old and attended sessions with her every other week.  (*Id.*)

### b. *Vocational Expert Testimony*

Barbara A. Dunlap, a vocational expert ("VE"), also testified at the hearing. (R. at 46-51.) She characterized Plaintiff's prior jobs as a caregiver and short order cook as being light in exertion and semi-skilled.  (R. at 46.)  She noted that Plaintiff had one short position as a ward clerk, but that she was not considering the position because it was terminated after a few months.  (*Id.*)  The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education, and work experience could perform work with the following limitations:  occasionally lift and carry 50 pounds; occasionally lift and carry 25 pounds; stand and walk about six hours in an eight-hour day and sit about six hours in an eight-hour day; no push/pull limitation; no postural limitations; no manipulative limitation; no visual or communication limitation; no environmental limitation; would be able to understand, remember, and carry out short simple instructions in a simple routine work

environment; could make judgments on only simple work-related decisions; only incidental public contact; could interact appropriately with supervisors and co-workers in a simple and routine work environment; and could respond to those work pressures in a simple and routine work environment, and respond to changes in the work setting. (R. at 47.) The VE opined that the hypothetical person could not perform any of Plaintiff's past relevant work, but could perform light and medium work such as a laundry worker (10,000 positions in Texas and in excess of 95,000 in the national economy), cleaner (15,000 to 20,000 positions in Texas and in excess of 100,000 in the national economy), and packager (4,000 positions in Texas and 80,000 in the national economy). (R. at 48-49.)

Plaintiff's attorney asked the VE to assume that the person in the ALJ's hypothetical had the following additional limitations: being markedly limited/effectively precluded from performing the activity in a meaningful manner, markedly limited in the ability to maintain attention and concentration for extended periods of time, perform activities within a schedule, maintain regular attendance and be punctual within the customary tolerances, and sustain ordinary routine without supervision. (R. at 50-51.) The VE testified that the individual with the additional limitations would not be able to perform any job. (R. at 51.)

## C. ALJ's Findings

The ALJ denied Plaintiff's application for benefits by written opinion issued on April 28, 2008. (R. at 24.) At step one, the ALJ determined that Plaintiff met the insured status requirements through December 31, 2011, and had not engaged in substantial gainful activity since April 1, 2008, the alleged date of onset of disability. (R. at 12.) At step two, he found that she suffered from severe impairments, including bipolar disorder, panic disorder, and polysubstance abuse. (R. at 13.)

13

At step three, he found that Plaintiff's impairments met a listed impairment. (R. at 13.) He also found that if she stopped the substance use, the remaining limitations would cause more than a minimal impact on her ability to perform basic work activities, and she therefore would continue to have a severe impairment or combination of impairments. (R. at 18.) He found, however, that absent that substance abuse, Plaintiff would not have an impairment or combination of impairments that meets or medically equals any of the listed impairments. (R. at 19.)

The ALJ next determined that absent the substance abuse, Plaintiff would have the RFC to occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and walk about six hours in an eight-hour day; and sit for about six hours. (R. at 19.) He found that she was able to understand, remember, and carry out short simple instructions; make judgments on simple work-related decisions; have only incidental interaction with the public; interact appropriately with supervisors and co-workers; and respond appropriately to usual work pressures and changes in the work setting. (R. at 19-20.) At step four, the ALJ found that absent her substance abuse, Plaintiff would not be able to perform past relevant work. (R. at 22.) At step five, the ALJ found that absent her substance abuse, she retained the ability to perform other work existing in the national economy. (R. at 23.) He explained that because she would not be disabled if she stopped the substance use, her substance use disorders were a contributing factor material to the determination of disability. (R. at 24.) He concluded that Plaintiff had not been disabled, as defined in the Social Security Act, at any time from April 1, 2008, the alleged onset date, through April 28, 2010, the date of the decision. (R. at 24.)

## II.  ANALYSIS

### A.  <u>Legal Standards</u>

#### 1.  Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id.*  Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *See id.* at 436 & n.1.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

16

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at Step Five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3. Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse the Commissioner's decision and remand the case solely for calculation and awarding of benefits. (*See* Pl. Br. at 22.) When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, 2009 WL 3029772, at * 10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id.* at * 11 (citation omitted). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005). The Commissioner, not the

court, resolves evidentiary conflicts.  *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

**B.  Issues for Review**

Plaintiff raises the following issues for review:

1. Whether Plaintiff's substance use disorder is material to finding her *per se* disabled under medical listing 12.04 and/or 12.06;

2. Whether the Commissioner failed to properly consider the medical source opinions of record;

3. Whether the ALJ failed to properly evaluate Plaintiff's credibility; and

4. Whether the ALJ relied upon flawed vocational expert testimony.

(Pl. Br. at 1.)

**C.  Issue One: Plaintiff's Substance Use Disorder**

Plaintiff contends that the ALJ's findings that her substance use disorder was material to a finding of disability under medical listing 12.04 and/or 12.06 was erroneous and not supported by substantial evidence.  (*See* Pl. Br. at 13.)

An individual is not disabled if alcoholism or drug addition is a contributing factor material to the determination of disability. 42 U.S.C. § 1382c(a)(3)(J).  In determining whether drug or alcohol addiction is a contributing factor material to the determination of disability, the ALJ considers whether a claimant would still be found disabled if he or she discontinued using drugs or alcohol.  20 C.F.R. § 404.1535(b)(1).  If a claimant's remaining limitations after discontinuing substance abuse would not be disabling, drug or alcohol addiction is a contributing factor material to the determination of disability, and the claimant will be found not disabled.  20 C.F.R. § 404.1535(b)(2)(I).  The claimant bears the burden of proving that drug or alcohol addiction is not a material contributing factor to his disability.  *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999).

18

Here, the ALJ's finding that Plaintiff would not be disabled absent her substance use is not erroneous and is supported by substantial evidence of the record. First, the record contains evidence showing that Plaintiff continued to use drugs during the relevant time period. On August 7, 2008, when Plaintiff presented herself at the MHMR, she reported drinking two beers three days in a row with two Valium pills one week earlier. (R. at 214.) Her initial urinalysis indicated she had taken Valium prior to admission, and she admitted that she had been taking Valium. (R. at 220.) Plaintiff stated that only a "Xanax bar" would assist her and became angry when she was not prescribed that medication. (R. at 213, 215, 218.) On August 11, 2008, clinicians noted "moderate co-occurring" substance abuse while evaluating her condition. (R. at 414.) On August 13, 2008, Plaintiff told clinicians that she was intentionally going to overdose on black tar heroin upon returning home, and they recommended a substance abuse program for her. (R. at 321.) On August 21, 2008, following discharge from group therapy, she reported that she had "much antidepressant benefit" from Prozac. (R. at 219.) When Dr. Smith adjusted her medication in order to obtain mood stabilization, she "began demanding Klonopin". (R. at 220.) Dr. Smith explained that he would not prescribe addictive medication due to her substance abuse, and that her anxiety would "greatly diminish" with mood stabilization. (R. at 220.) In March 2009, Plaintiff reported that she had been pulled over twice for driving under the influence since July 2008. (R. at 327). She admitted at the hearing before the ALJ that she was arrested in December 2009 for driving while intoxicated. (R. at 41). In her initial application for benefits, she described her social activities as "sit[ting] at the kitchen table and smok[ing] and drink[ing] and talk[ing]". (R. at 148.)

Second, the record contains evidence showing that Plaintiff's condition improved when she stopped using drugs and alcohol. (R. at 484.) For example, in January 2009, when Plaintiff reported

she had not used drugs in the previous month (R. at 400), she had an improved GAF score of 60 (R. at 396), and she had made some progress due to her ability to remember coping skills. (R. at 313.) By March 2009, MHMR clinicians required Plaintiff to complete a new treatment plan item vowing to keep away from drugs and alcohol and to stay sober for at least one year. (R. at 489.) A clinician noted at the time that Plaintiff was responsive, held appropriate conversations, and had made "some" progress due to her sobriety. (R. at 473.) After a consultative evaluation around the same time, Dr. Goodness reported several normal and stable mental findings. (R. at 325-328.)

Plaintiff's February 26, 2010 inpatient admission to Trinity Springs Pavilion likewise supports the ALJ's conclusion that her condition improved absent drugs and alcohol. (R. at 13-18.) Plaintiff sought voluntary commitment, and she was suspected to be non-compliant with medication. (R. at 447.) Her mental evaluation showed illogical and disorganized thought processes, flight of ideas, and a dysphoric mood. (R. at 454.) On March 1, 2010, after three full days of drug and alcohol abstinence and medication, Plaintiff was "calm and peaceful" with well-organized thought processes, good concentration, intact memory, normal speech, and appropriate affect. (R. at 462.) By March 5, 2010, Plaintiff reported she was "feeling surprisingly good", slept better than usual, felt relieved, and demonstrated normal mental findings. (R. at 471.)

The ALJ's finding that absent drug abuse, Plaintiff's conditions did not meet or equal a listed impairment, is not erroneous and is supported by substantial evidence of the record. Plaintiff's motion for summary judgment should therefore be denied on this ground.

## D.  Issue Two: Medical Source Opinions

Plaintiff next argues that the ALJ failed to properly consider the medical source opinions of Drs. Jordan and Smith. (*See* Pl. Br. at 20.)

### 1. Dr. Jordan

Plaintiff first argues that the ALJ failed to give controlling weight to the treating source opinion of Dr. Jordan that she had marked limitations in numerous areas of daily mental functioning, experienced episodes of decompensation, was incapable of even low stress work, and would frequently be absent from work.  (*Id*. at 16-18.)   She claims that Dr. Jordan's opinion was based on detailed clinical findings and diagnostic testing and was bolstered by findings from all the other treating and examining medical sources in the record, including Dr. Mount, a consultative psychologist, and Dr. Goodness, the administration's own psychologist.  (*Id.*)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence.  20 C.F.R. § 404.1527(c)(2).  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  20 C.F.R. § 404.1527(d).  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant.  20 C.F.R. § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight.  20 C.F.R. § 404.1527(d).  If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion:  (1) whether the source examined the claimant; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the

opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."  *See id.* §
404.1527(d)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).  If evidence supports a contrary conclusion, an opinion of any physician may be rejected.  *Id.*  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Id.* at 455-56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)."  *Id.* at 453.  A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion."  *Id.* at 458.

Here, Dr. Jordan opined in a September 2009 letter that Plaintiff was totally disabled, and that drug and alcohol abuse was not a material cause of her disability.  (R. at 365.)  Even though Dr. Mount reached a similar conclusion that Plaintiff was permanently disabled (R. at 221), a

treating physician's opinions regarding a Plaintiff's disability are legal conclusions and have no special significance.  20 C.F.R. § 416.927(e); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir.2003).  Because physicians generally define "disability" in a manner distinct from the Act, an ALJ can properly reject any conclusion of disability as determinative on the ultimate issue. *See Tamez v. Sullivan*, 888 F.2d 334, 336, n.1 (5th Cir. 1989) (doctor's note that claimant was "disabled" did not mean that the claimant was disabled for purposes of the Act).  Whether an individual's substance abuse is material to disability also speaks to whether an individual is truly disabled and is therefore also an issue reserved to the ALJ.  *See* 20 C.F.R. §§ 404.1527(e), 416.927(e).

Dr. Jordan further opined in a September 2009 psychological assessment that Plaintiff had marked limitations in numerous areas of daily mental functioning, was incapable of even low stress work, experienced episodes of decompensation, and would frequently be absent from work.  (R. at 369-73.)   The ALJ was entitled to reject Dr. Jordan's assessment for three reasons. First, there were inconsistencies between the assessment and her narrative report dated February 28, 2010.  (R. at  366-373, 442.)  In her narrative report, Dr. Jordan indicated that she began treating Plaintiff on August 28, 2009, only two weeks prior to preparing her assessment (R. at 442), while in the assessment at issue, she stated that she had treated Plaintiff on a weekly basis since 1989 (R. at  366).  Second, the assessment is not corroborated by any treatment records; Plaintiff concedes that Dr. Jordan's treatment records are not part of the certified transcript.  (Pl. Br. at 5.)  Good cause exists to disregard a physician's statements that are otherwise unsupported by the evidence.  *See Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995).  Finally, Dr. Jordan's assessment is not consistent with the record as a whole.  During her March 2009 consultative

evaluation with Dr. Goodness, Plaintiff made appropriate eye contact, was cooperative, did not

exhibit any unusual behaviors, and had normal speech, appropriate responses, logical, relevant,

and goal directed thought processes with focused thought content and no evidence of a thought

disorder.  (R. at 325-27.)  While she reported limited daily activities, Dr. Goodness noted no

evidence that she would have any problems getting along with supervisors or any likelihood that

she would exhibit poor social judgment.  (R. at 326.)  Dr. Goodness noted that Plaintiff did not

appear to maintain a level of concentration necessary to complete tasks, based on Plaintiff's own

report (R. at 326), which conflicts with Plaintiff's application for benefits, in which she stated

that she could pay attention for "a long time," follow instructions "very well," (R. at 149) and

had a "good" ability to handle changes in routine (R. at 183).  After examination, Dr. Goodness

noted that Plaintiff's attention and concentration were only moderately impaired, her immediate

memory was satisfactory, her remote memory appeared intact, and her delayed memory was only

mildly impaired.  (R. at 327-328.)

Plaintiff argues that Dr. Goodness confirmed the diagnoses from other sources, opined

that Plaintiff's prognosis was poor, and assigned her a GAF score of 45 that is inconsistent with

an ability to work.  (Pl. Br. at 17-18.)  However, the mere mention of a condition in the medical

records does not establish a disabling impairment or even a significant impact on that person's

functional capacity.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (noting that the

mere presence of some impairment is not disabling per se and that the claimant must show that

she is so functionally impaired by the impairment that she is precluded from engaging in any

substantial gainful activity).  Additionally, despite Dr. Goodness's notation of a poor prognosis,

her findings do not indicate that Plaintiff's condition would be disabling absent substance abuse.

(R. at 327-328.)  Further, "federal courts have declined to find a correlation between an individual's GAF score and the ability or inability to work."  *See Murdock v. Astrue*, 2010 WL 3448084 at *8 (N.D. Tex. Aug. 3, 2010) (citing 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000). Dr. Goodness' assessment supports the ALJ's finding that Plaintiff can perform work activity absent substance abuse.  (R. at 18-20.)

Plaintiff also argues that Dr. Jordan's assessment is supported by Dr. Mount's consultative evaluation, which similarly found that Plaintiff had marked limitations across almost all areas of daily mental functioning.  (Pl. Br. at 17.)  Dr. Mount assessed Plaintiff in December 2009, the same month that Plaintiff was arrested for driving while intoxicated.  (R. at 41, 420-424.)  Plaintiff's reports of a labile mood, suicidal ideation, visual hallucinations, and post-traumatic stress disorder symptoms during that time period were reasonably attributed to alcohol abuse.  (R. at 19-21, 421.) Dr. Mount's assessment of marked limitations does not support Dr. Jordan's assessment, as it is not indicative of Plaintiff's ability to function absent alcohol abuse, and the ALJ had good cause to reject it.

Plaintiff finally contends that the ALJ should have conducted a more thorough analysis of the factors listed in 20 C.F.R. §§ 404.1527(d), 416.927(d).  As discussed, however, a detailed analysis is only required "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist."  *See* Newton, 209 F.3d at 455-56.  Here, the ALJ carefully outlined all of the evidence from the treating and examining sources before rejecting the opinion of Dr. Jordan.  This evidence included evidence controverting Dr. Jordan's assessment from Dr. Goodness, a consultative examiner.  Although not in a formalistic fashion, the ALJ weighed the opinions of the examining and treating psychologists, and assigned more weight to the examining

psychologist.  He was therefore not required to perform the six factor analysis under 20 C.F.R. §§ 404.1527(d), 416.927(d).

The ALJ's rejection of Dr. Jordan's opinions is not erroneous and is supported by substantial evidence of the record.

### 2.  Dr. Smith's March 31, 2009 Letter Report

Plaintiff contends that the Appeals Council erred by failing to consider Dr. Smith's March 31, 2009 report, which constituted new and material evidence requiring remand.  (Pl. Br. at 18-19.)

If a claimant submits new and material evidence that relates to the period before the ALJ's decision, the Appeals Council must consider the evidence in deciding whether to grant a request for review of an ALJ's decision.  20 C.F.R. § 404.970(b).  Evidence submitted for the first time to the Appeals Council is considered part of the record upon which the Commissioner's final decision is based.  *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005).  A court considering that final decision should review the record as a whole, including the new evidence, to determine whether the Commissioner's findings are supported by substantial evidence, and should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes insufficiently supported.  *Higginbotham v. Barnhart*, 163 F. App'x 279, 281–82 (5th Cir. 2006).[2]

Dr. Smith noted in his report that Plaintiff had an extensive psychiatric treatment history and that he was treating her for bipolar I disorder mixed severe with psychosis, anxiety disorder NOS,

---

[2] Here, the Appeals Council did not specifically address the additional evidence in reviewing the ALJ's decision. Even though its internal Hearings, Appeals and Litigation Law Manual ("HALLEX") requires it to specifically address the additional evidence and legal arguments submitted in Plaintiff's request for review, this requirement has been temporarily suspended by a memorandum from the Executive Director of Appellate Operations, dated July 20, 1995. *See Newton*, 209 F.3d at 559 (citing HALLEX §§ I-3-501); *Higginbotham*, 405 F.3d at 335 n. 1.

polysubstance dependence history, and borderline personality disorder. (R. at 493.) He stated that her symptoms included severe depression with suicidal thoughts and lack of energy and motivation, severe irritable mood swings with potential for violence to others and racing thoughts with inability to concentrate, psychotic symptoms including severe paranoia and auditory hallucinations, profound anxiety, and general emotional lability. (*Id.*) He opined that Plaintiff's psychiatric condition was permanent and required ongoing treatment. (*Id.*) He also opined that Plaintiff was unable to meet the demands of or cope with the stress of a workplace. (*Id.*)

Defendant argues that the evidence is not new because it was dated more than a year prior to the ALJ's decision, and it is not material because it merely mirrored evidence already before the ALJ and would not require changing the ALJ's decision. (D. Br. at 20-21.) Even assuming that the report is new, it is not material. While it lists the impairments for which Plaintiff has been treated and their symptoms, it fails to assess what her limitations would be absent the alcohol and drug abuse. (R. at 13, 24, 491.) As discussed, the overwhelming factor in the ALJ's finding of non-disability was her alcohol and drug abuse. The ALJ acknowledged that Plaintiff would be considered disabled if her alcohol and drug abuse was taken into account. Accordingly, the Appeals Council did not err in failing to issue a new decision or in failing to remand the case back to the ALJ for further action.

## E.  Issue Three: Credibility

In her third issue for review, Plaintiff contends that the ALJ failed to properly assess her credibility and to consider "any" of the factors required by the Commissioner's rulings and regulations. (Pl. Br. at 19-21.) Plaintiff complains that the ALJ improperly assessed her credibility on three bases: her non-compliance with treatment; her demeanor at the hearing; and her use of

drugs and alcohol.  (Pl. Br. at 20.)

Credibility determinations by an ALJ are entitled to deference.  *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991).   The ALJ is in the best position to assess a claimant's credibility since the ALJ "enjoys the benefit of perceiving first-hand the claimant at the hearing."  *Falco v. Shalala*, 27 F.3d 164 n.18 (5th Cir. 1994).  SSR 96-7p requires the ALJ to follow a two-step process for evaluating a claimant's subjective complaints.  SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).   First, the ALJ must consider whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  *Id.*  Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities.  *Id.*  If  the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's statements.  *Id.*; *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

The ALJ's credibility determination must be based on a consideration of the entire record, including medical signs and laboratory findings, and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effect.  SSR 96-7p, 1996 WL 374186, at *2.  The ALJ must also consider a non-exclusive list of seven relevant factors in assessing the credibility of a claimant's statements: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms;

(6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." *Id.* at *3. The ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence. *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir.1990).

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to product some of the alleged symptoms," but that her statements about the intensity, persistence, and limiting effects of her symptoms were "not generally credible". (R. at 21.) It is clear from the ALJ's decision that he reviewed the evidence before applying several of the credibility factors listed in SSR 96-7p to Plaintiff's case. (R. at 13-22.) *See* SSR 96-7p, 1996 WL 374186 at *3 (credibility factors include consideration of daily activities, frequency and intensity of claimant's symptoms, and treatment claimant receives to alleviate symptoms).

Specifically, the ALJ noted that Plaintiff's condition appeared to improve when she abstained from drugs and alcohol and sought regular medical care. (R. at 21-22.) On March 11, 2009, Plaintiff underwent an evaluation in which Dr. Goodness noted several normal and stable mental findings. (R. at 325-328.) Also in March 2009, clinicians noted that Plaintiff had made "some" progress due to her sobriety. (R. at 473.) Additionally, from February 26, 2010 through March 5, 2010, while she was medicated and restricted from drug and alcohol use, Plaintiff had well-organized thought processes, good concentration, intact memory, normal speech, and an appropriate affect. (R. at 462, 471.) Plaintiff was also able to engage in significant activities of daily living including performing simple household chores, preparing simple meals or snacks, attending to her own personal hygiene, and attending church. (R. at 19, 148, 326.) These activities discredit her

29

allegations of disabling mental impairments.  *See Anthony v. Sullivan,* 954 F.2d 289, 296 (5th Cir. 1992) (ALJ properly determined claimant not disabled when she could care for her personal needs, cook meals, drive her car once or twice a week, and regularly attended church services).

The ALJ also pointed to evidence of Plaintiff's drug-seeking behavior.  (R. at 21-22.)  He noted that on August 7, 2008, Plaintiff became angry when not given a "Xanax bar."  (R. at 215.) On August 21, 2008, Plaintiff "demanded" Klonopin, but it was not given to her due to its addictive nature.  (R. at 220.)  On December 17, 2008, Plaintiff requested a large amount of Xanax from Dr. Swain, but it was not prescribed because she had abused it in the past.   (R. at 262.)  *See Anderson v. Shalala,* 51 F.3d 777, 780 (5th Cir. 1995) (claimant's drug-seeking behavior cast a "cloud of doubt" over her treatment history).   This evidence of drug-seeking behavior also discredits Plaintiff's assertion that she was disabled absent substance abuse.  (R. at  21-22.)

The ALJ considered Plaintiff's non-compliance with medication based on several periods of non-compliance in the record.  (R. at 213, 447, 473.)  She stopped treatment with MHMR in 2007 and did not begin treatment again until after her May 2008 arrest for driving under the influence. (R. at 22.)  She reported that she had been receiving mental health treatment since she was nineteen-years-old but had not taken medication for her conditions for a year-and-a-half.  (R. at 213).  An ALJ may properly consider a claimant's failure to follow her prescribed treatment and medication regimen as an indication that her conditions were not disabling.  *See Johnson v. Sullivan*, 894 F.2d 683, 685 n.4 (5th Cir. 1990) (failure to follow treatment grounds for finding of not disabled). Accordingly, the ALJ considered the evidence before him prior to concluding that Plaintiff's subjective complaints were not credible to the extent alleged.  (R. at 13-22.)

The ALJ also noted that it appeared that Plaintiff was under the influence of illicit substances

at the hearing because her speech was slow and sometimes slurred. (R. at 21.) Plaintiff complains that it was inappropriate for the ALJ to speculate that her manner of speech at the hearing was caused by her substance use because she suffers from significant mental limitations treated with heavy psychotropic medication. (Pl. Br. at 20.) Because the ALJ observed Plaintiff first-hand at the hearing, he was in the best position to assess her credibility. *See Falco*, 27 F.3d 164 n.18 (5th Cir. 1994). Moreover, as Defendant notes, even if the ALJ improperly evaluated Plaintiff's demeanor at the hearing as part of his credibility analysis, there is no indication that his analysis would have changed given Plaintiff's non-compliance with medication and substance use history absent this observation. (D. Br. at 24.)

Again, although not in a formalistic fashion, the ALJ considered the factor for determining credibility, and relied on substantial evidence to support his credibility assessment. Remand is therefore not required on this issue as well.

## F.  Issue Four: Flawed Vocational Expert Testimony

Plaintiff argues that the ALJ relied on flawed VE testimony in making her disability determination because the testimony was produced in response to an improper hypothetical question that did not include all of her limitations borne out by the record. ( Pl. Br. at 21.) She contends that the VE's testimony does not constitute the substantial evidence needed to meet the Commissioner's burden of proof at step five. (*Id.*)

To establish that work exists for a claimant at steps four and five of the sequential disability determination process, the ALJ relies on the medical-vocational guidelines or the testimony of a VE in response to a hypothetical question. *See Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's

disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Id*. at 436. A claimant's failure to point out deficiencies in a hypothetical question does not "automatically salvage that hypothetical as a proper basis for a determination of non-disability." *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001). If the ALJ relies on testimony elicited by a defective hypothetical question in making a disability determination, the Commissioner does not carry his burden of proof to show that a claimant could perform available work despite an impairment. *Id*. at 708.

Here, the ALJ presented a hypothetical question to the VE asking whether work existed for an individual with Plaintiff's age, education, and residual functional capacity for medium work with additional limitations to accommodate her severe mental impairments. (R. at 23, 47-48.) This hypothetical question properly incorporated all of Plaintiff's limitations supported by the record and recognized by the ALJ. *See Masterson v. Barnhart,* 309 F.3d 267, 273 (5th Cir. 2002) (upholding ALJ's hypothetical question when it scrupulously incorporated all of the claimant's disabilities supported by evidence and recognized by the ALJ). Substantial evidence therefore supports the ALJ's step five finding that Plaintiff could perform work that existed in significant numbers in the national economy. (R. at 22.) Moreover, the ALJ properly rejected the VE's testimony that an individual with the additional limitations listed by Plaintiff's counsel would not be able to perform any work activity. An ALJ is not bound by vocational expert testimony that is based upon evidentiary assumptions that he ultimately rejects. *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985). Accordingly, no error occurred and remand is not required on this ground.

## III.  RECOMMENDATION

Plaintiff's motion should be **DENIED,** Defendant's motion should be **GRANTED**, and

the final decision of the Commissioner should be **AFFIRMED**.

**SO RECOMMENDED**, on this 21st day of October, 2011.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

33